UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
MICHAEL STEWART,                                                        :
                                                                        :
                              Petitioner,                               :
                                                                        :
                                                                        :        25-CV-4246 (JMF)
              -v-                                                        :
                                                                        :        OPINION AND ORDER
MARIEJOSEE KING, *Superintendent*, *Clinton*                           :
*Correctional Facility*,                                                :
                                                                        :
                              Respondent.                               :
                                                                        :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

"I'm done."  Three times Petitioner Michael Stewart uttered those words during a

December 2015 police interrogation about a murder committed over two decades earlier, in

September 1993.  Yet each time, the Detectives conducting the interrogation plowed ahead and

continued asking Stewart questions.  Stewart's responses to that questioning were admitted

against him at trial for the September 1993 murder and figured prominently in the State's case

against him, so much so that the State itself later conceded that, absent Stewart's statements,

there "was insufficient evidence to establish [his] guilt beyond reasonable doubt."  ECF No. 24-1

("Resp.'s State Habeas Mem."), at 21.  Stewart was convicted of second-degree murder and

sentenced principally to an indeterminate term of twenty years' to life imprisonment.  On appeal,

he challenged the admission of his statements on the ground that, by saying "I'm done," he had

invoked his right to remain silent and that admission of statements elicited by the Detectives'

questioning thereafter therefore violated his rights under the Fifth Amendment to the U.S.

Constitution.  The state courts rejected that argument on the ground that, "when viewed in

context" — including Stewart's answers to later questions — "certain phrases used by defendant

did not constitute requests to terminate the interview or unequivocal assertions of the right to remain silent." *People v. Stewart*, 216 A.D.3d 463, 465 (N.Y. App. Div. 1st Dep't 2023).

Stewart now petitions, pursuant to 28 U.S.C. § 2254, for the writ of habeas corpus. *See* ECF No. 1 ("Pet."). In his Petition, Stewart renews his argument that the trial court violated his Fifth Amendment rights by admitting statements that he made after he had invoked his right to remain silent. *See* Pet. 6-7; *see also* ECF No. 2 ("Pet.'s Mem."), at 1. The Court agrees. At least two of the three times that Stewart uttered the phrase "I'm done," his words were sufficiently unambiguous to qualify, under settled Supreme Court precedent, as invocations of his right to remain silent. By concluding otherwise, and by doing so based substantially on Stewart's answers to subsequent questioning by the Detectives, the state courts reached a conclusion that was contrary to, and an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Further, that error plainly resulted in "actual prejudice" to Stewart, as the State's own prior admission — that, absent Stewart's statements there would have been insufficient evidence to convict him — makes clear. Accordingly, and for the reasons that follow, Stewart's Petition is GRANTED.

## BACKGROUND

This case arises from a murder that occurred over three decades ago, on September 20, 1993. On that date, Sophia Blair ("Sophia") — with whom Stewart was in a romantic relationship — was found dead in her Bronx apartment; the cause was a gunshot to her head. Tr. 88-89, 232-35, 380.[1] Soon after Sophia was murdered, Stewart — using the name "Peter" —

---

[1]     "Tr." refers to the trial transcript of Stewart's second trial, ECF No. 1-10; "Hearing Tr." refers to the transcript of his 2017 suppression hearing, ECF No. 1-8; "Int. Tr." refers to the transcript of the interrogation, ECF Nos. 21-1, 21-2, 21-3; and "Video" refers to the interrogation video that was submitted by Respondent, *see* ECF No. 22, and is on file with the Court.

called Sophia's father, Esbourne Blair ("Esbourne"), collect from Jamaica.  Tr. 83-84.  Esbourne

did not know Stewart by the name Peter — or, for that matter, by the names Michael Stewart or

Kenneth Hall (an alias that, as discussed below, Stewart was later discovered to use) — but

Stewart identified himself using the nickname by which Esbourne knew him and Esbourne

recognized his voice.  Tr. 83-84; *see* Tr. 68.  Stewart reported that Sophia had been shot and that

their infant son, Jamal Greene, was in a crib inside the apartment; Stewart told Esbourne that he

had fled to Jamaica because he feared being blamed for Sophia's death.  Tr. 84.

**A.  The Investigation**

In a search of the apartment, the New York City Police Department ("NYPD")

discovered one discharged .380 caliber shell casing in Sophia's bedroom, likely discharged from

a semiautomatic handgun, Tr. 24, 196-213, as well as thirteen fingerprints on the inside front

doorknob and on items around the apartment, Tr. 37-42, 55.  No fingerprints were lifted from the

outside of the front door or from any of the furniture or mirrors, Tr. 49-58, and no firearm was

ever recovered, Tr. 208.  Of the thirteen fingerprints that were recovered, eight were of "no

value"; two — one found on the telephone and one found on the bathroom faucet — matched

Stewart; and three — from Sophia's bedroom — were "of value" but did not match Stewart or

anyone known to the investigators.  Tr. 296-97, 309, 311-12, 317-18, 392, 407.

A few weeks after the murder, Esbourne brought NYPD Detective Christopher Baldassari

— who had been assigned to investigate Sophia's death — documents with the name "Kenneth

Hall" and Sophia's address.  Tr. 130, 150.  Detective Baldassari then discovered that "Kenneth

Hall" was listed as a passenger on a September 20, 1993 flight to Jamaica; he concluded that

Stewart had used the alias to flee the country and would not return to the United States.  Tr. 151-

52.  At that point, Stewart became the primary suspect in Sophia's murder and no other leads or

suspects were pursued.  Tr. 154, 165-66, 169.  The case went cold, and Detective Baldassari

eventually retired without charging anyone.  Tr. 153-54.  Detective Baldassari's assumption that

Stewart would remain in Jamaica, however, was incorrect; as it happens, on September 22, 1993,

two days after Sophia's murder, he returned under the name Michael Stewart.  Tr. 383-385.

Over two decades later, in 2014, NYPD Detectives Ronald Jimick and Joseph O'Neil

were assigned to reopen Sophia's "cold case" homicide.  Hearing Tr. 28, 45.  About one year

after that, in August 2015, Connecticut State Trooper Michael Quagliaroli was investigating

Stewart — who was known to Trooper Quagliaroli as "Kenneth Hall" — for identity theft.

Hearing Tr. 4.  Because the victim of the identity theft was a Bronx resident, Trooper Quagliaroli

contacted the NYPD and was connected to Detective Jimick.  Hearing Tr. 19.  Trooper

Quagliaroli eventually obtained an arrest warrant for Stewart and coordinated with Detectives

Jimick and O'Neill to come speak with Stewart about "the Bronx matter" after Stewart was taken

into custody.  Hearing Tr. 4-8, 20, 29-30.  Stewart was arrested on December 1, 2015, and taken

to police barracks in Hartford, Connecticut, for questioning.  Hearing Tr. 7.

**B.  The Interrogation**

There is no dispute that, at the outset of the interrogation, at approximately 7:50 a.m.,

Trooper Quagliaroli advised Stewart of his rights to remain silent and to a lawyer.  Hearing Tr.

7-13.  Specifically, Trooper Quagliaroli advised Stewart: "If you wish to answer questions, you

have the right to stop answering at any time.  You may stop answering questions at any time to

talk to a lawyer and you may have a lawyer with you during any further questioning."  Hearing

Tr. 13.  Stewart signed forms waiving his rights and agreed to answer questions.  Hearing Tr. 14-

17.  At some point, Trooper Quagliaroli told Stewart that he "had been working in conjunction

with some detectives from New York" who "would like to speak" with Stewart "as well," and he

brought in Detectives Jimick and O'Neil.  Hearing Tr. 21.  Detectives Jimick and O'Neil

proceeded to question Stewart for approximately two hours.  Hearing Tr. 32.

     The Detectives began the interview — which was recorded on video — by asking

questions about Stewart's children and girlfriends.  *E.g.*, Int. Tr. 1-35; Video 9:43:00-9:46:30.

About forty minutes into the interview, the Detectives showed Stewart a photograph of Sophia.

Video 9:49:33.  He denied knowing the woman in the photograph.  Int. Tr. 40; Video 9:49:30-

9:49:50.  Shortly thereafter, the Detectives asked Stewart about his parents' names.  Int. Tr. 41;

Video 09:49:58-9:50:14.  The following exchange then took place:

| | |
|---|---|
| Stewart: | Now, all of these questions and stuff, just — just get the nail on the head because I'm — I don't know what this is about.  I'm — I'm — *I'm done saying what I got to say because I don't know nothing.* |
| Det. Jimick: | Well, let me ask you — let me ask you something. |
| Stewart: | I don't know nothing about nothing. |

Int. Tr. 41-42 (emphasis added); Video 9:50:30-9:50:43.  The Detectives then transitioned to

questions about Stewart's prior arrest for selling drugs.  Int. Tr. 42; Video 9:50:43.

     A few minutes later, the Detectives asked Stewart additional questions about his identity,

his relationship with Sophia, and whether he flew to Jamaica in 1993.  Int. Tr. 51-82; Video

9:56:00-10:13:54.  Stewart insisted that he did not know Sophia and that he was not the father of

her son.   Int. Tr. 51-53; Video 9:56:23-09:57:25.  He indicated that he had traveled to Jamaica

and had been caught with two suitcases of drugs.  Int. Tr. 82-83; Video 10:13:40-10:14:06.  The

following exchange then took place:

| | |
|---|---|
| Det. O'Neil: | Where did they catch it? |
| Stewart: | In the airport. |
| Det. O'Neil: | Which airport? |
| Stewart: | I don't remember, man, because they — |

| | |
|---|---|
| Det. O'Neil: | Well, it's either Jamaica or New York. |
| Stewart: | They sent me right back here.  I don't remember. |
| Det. O'Neil: | Wait a second, Kenneth, um, Michael. |
| Stewart: | *I'm done.* |
| Det. O'Neil: | Kenneth, forget about that.  We're not the drug — hey, Michael — |
| Det. Jimick: | We're not the drug — Kenneth, Kenneth, Kenneth, listen to me.  Hold on a second.  We're not the drug police. |

Int. Tr. 83-84 (emphasis added); Video 10:14:06-10:14:26.  When Stewart said "I'm done," he sighed deeply.  Video 10:14:20.  After noting that they were not "the drug police," the Detectives resumed asking questioning Stewart about his prior drug trafficking.  Int. Tr. 84; Video 10:14:23.

A few minutes later, the Detectives pivoted to questions about whether Stewart had applied for a driver's license under the name Kenneth Hall.  Int. Tr. 87; Video 10:16:34.  Stewart acknowledged that the signature on a document the Detectives showed him could have been his, but he denied ever having a driver's license under the name Kenneth Hall.  Int. Tr. 88-89; Video 10:16:58-10:17:46.  Specifically, the following exchange took place:

| | |
|---|---|
| Stewart: | I never — I never had a — I never had a driver's license named Kenneth Hall.  I never had one with — by the name, Kenneth Hall.  I had one by the name Michael Stewart.  Never, never had a driver's license by the name of Kenneth Hall.  I had — I had one by the name of Michael Stewart — |
| Det. O'Neil: | I have to keep digging papers out. |
| Stewart: | — because *I'm telling you I'm done, and you're still going here.* |
| Det. O'Neil: | You're done? |
| Stewart: | But you're — |
| Det. Jimick: | Because your memory is — it needs massaging. |
| Det. O'Neil: | Because you forget.  I'd forget too if I had all these kids. |
| Stewart: | You guys gaming me or what?  You guys coming, you gaming me? |

Int. Tr. 89 (emphasis added); Video 10:17:23-10:18:08.  Detective O'Neil denied that they were

gaming Stewart, and the Detectives then resumed their questioning.  Int. Tr. 89-90; Video

10:18:09.  The interrogation continued for approximately one more hour.

During that hour, Stewart initially denied knowing Sophia, living in her apartment, and

calling Esbourne on the day of the murder.  Int. Tr. 40, 102-08, 111-12; Video 9:49:30-50,

10:25:18-10:28:42, 10:29:42.  Eventually, however, he made a number of significant statements,

to wit:

- that he had "seen [Sophia] around," Int. Tr. 109; Video 10:28:51-10:29:05;

- that he remembered Sophia and some of the circumstances surrounding her death, Int. Tr. 111; Video 10:30:10;

- that he had had a romantic relationship with Sophia, that he had been to her apartment, and that he had met her child, Int. Tr. 117, 120-21; Video 10:33:50, 10:35:45;

- that during a prior domestic dispute in New Jersey, he had hit Sophia, and her parents and the police had come, Int. Tr. 122-23, 165; Video 10:34:40, 10:36:29, 11:01:45;

- that, sometime on the night of the murder, he had gone to Sophia's apartment, let himself in with a key, and found her dead and her son, Jamal, crying in his crib, Int. Tr. 129-31; Video 10:39:20-10:40:43;

- that the inside of the house was messy and that he saw a broken window and things "scattered all over" the apartment as if someone had been searching for something, Int. Tr. 129-34, 163, 186, 189; Video 10:39:20, 10:39:35, 10:40:40, 10:41:00, 10:41:32;

- that from the moment he found Sophia's body until the following afternoon, he called Sophia's father, Esbourne, many times from payphones in the Bronx to tell him that Sophia was dead and Jamal was in the apartment, Int. Tr. 134-39, 144-47, 150-52, 164-65; Video 10:40:30, 10:43:14, 10:43:30, 10:45:20;

- that, the next morning, he purchased an airplane ticket at the airport and left on an 11 a.m. flight to Jamaica because Esbourne refused to believe his claim that he did not kill Sophia, Int. Tr. 143-146, 164; Video 10:49:46-10:50:06, 11:00:56;

- that, after he landed in Jamaica, he called Esbourne again, Int. Tr.134, 138-40, 143-47, 151-52, 164, 167; Video 10:40:15, 10:47:10, 10:50:00, 10:54:00, 11:01:29, 11:03:15;

- that while he did not own a firearm, he sometimes carried a 9 mm gun that he had borrowed from a friend and that he had kept 9 mm bullets in Sophia's apartment, Int. Tr. 115-17, 153; Video 10:32:42-10:33:20, 10:55:34;

- that "everybody called [him] Peter" (which is the name that Esbourne knew him by), Int. Tr. 123, 183; Video 10:37:15; and

- that he had many girlfriends, at one point even stating: "I got 10,000 girls," Int. Tr. 163; Video 11:00:22.

Despite these admissions, Stewart emphatically denied having killed Sophia — stating that he "wouldn't kill [his] child's mother," Int. Tr. 139, 166-67; Video 10:46:25, 11:02:20, 11:02:50-11:12, because he loved her too much, Int. Tr.164, 167; Video 11:01:22, 11:02:50.  He hypothesized that Sophia had been killed in retaliation for a prior shooting of a rival gang member by her brother Donovan, who had been convicted of attempted murder less than one year earlier.  Int. Tr. 111-15, 118-19, 132, 140-42, 152; Video 10:30:42, 10:31:30, 10:34:10, 10:41:18; 10:47:40; *see also* Tr. 114 (Osbourne Blair testimony that Donovan was convicted for attempted murder for shooting someone within a year of Sophie's murder).

**C. The Motion to Suppress Stewart's Statements**

Approximately one year after this interview, Stewart was charged with Sophia's murder. In the proceedings that followed, he moved to suppress the statements he had made to Detectives Jimick and O'Neil, arguing, as relevant here, that he had invoked his right to remain silent when he stated three times during the Detectives' questioning that he was "done."  The prosecution acknowledged that Stewart "did indeed say I'm done or I'm gonna stop talking if you don't tell me what you're here for," but it insisted that Stewart's statements did not constitute invocations of the right to remain silent because Stewart "didn't follow up."  Hearing Tr. 65-66.

On June 5, 2017, the trial court denied Stewart's suppression motion from the bench, with an opinion to follow.  *See* Hearing Tr. 78 (denying the motion to suppress on the record); ECF No. 14-1 ("Suppression Op.").  As relevant here, in its written opinion, which was issued on July 10, 2017, the trial court ruled that Stewart did not "unequivocally invoke his right to remain silent" at any point during the interrogation.  Suppression Op. 12.  With respect to the first time that Stewart had said he was "done," the court reasoned:

> When considered "[i]n the context of the entire interrogation" it s [sic] clear that the defendant's statement that he was "done saying what [he] got to say" because he "know nothing about nothing" was not an unequivocal invocation of his right to remain silent but rather his insistence that he had nothing to add unless the detective "hit the nail on the head" and explain to the defendant "what this is all about.

*Id.* at 12-13 (citing *People v. Jones*, 258 A.D.2d 261 (N.Y. App. Div. 1st Dep't 1999)).  Looking at "the context of the entire interview," the trial court observed "that the questioning continued, as did the defendant's answers" and that those answers reflected Stewart's "ongoing interest in learning the purpose of the detective's inquiries."  *Id.* at 13.

With respect to Stewart's second and third statements that he was "done," the trial court reached a similar conclusion.  As to the second, the trial court explained: "Again, taken in context with the preceding interrogation and with what followed, it can be seen that [the] statement . . . was not an unequivocal invocation of [Stewart's] right to remain silent but rather, a statement that he had told them everything that he remembered and had nothing to add."  *Id.* at 14.  As to the third, the court explained: "The defendant's statements to the detectives reveal, again, his feeling that he had answered their questions; yet those same statements do not reflect an invocation of his right to remain silent."  *Id.* at 15.  In support of these conclusions, the trial court pointed explicitly and repeatedly to statements that Stewart had made in response to *subsequent* questioning.  *See id.* at 15-16.  These statements, the trial court reasoned, "evidence

9

the defendant's willingness to keep talking and his ongoing interest in seeking clarification as to what it was that the detectives were inquiring about." *Id.* at 15; *see id.* at 16 ("The conclusion that the defendant did not invoke his right to remain silent is reinforced by statements the defendant made thereafter."); *id.* ("As the interview continued, the defendant underscored his willingness to speak to the detectives."); *id.* ("[T]he defendant continued to speak to the detectives and to respond to their questions, throughout the remainder of the interview.").

## D.  The Trials

Stewart's trial began on June 5, 2017, but ended in a mistrial after the jury deadlocked. *See* Pet.'s Mem. 10 (citing Court Action Sheet); ECF No. 1-9, at 10 (First Trial Transcript from June 29, 2017).  Stewart's trial counsel reported at a subsequent hearing that, in interviews, the jurors had informed him that nine of the twelve jurors had voted to acquit.  ECF No. 21-4, at 4.

Stewart was retried beginning on October 10, 2017.  *See* ECF No. 1-10.  Stewart's statements during the interrogation figured prominently in the trial.  During its opening, for example, the prosecution told the jury that it would get to see portions of Stewart's interrogation and advised that Stewart had admitted to being at Sophia's apartment on the night of her death, to leaving her and her child there, and to calling her father afterward.  Tr. 4, 8.  During trial, a redacted version of the interrogation was introduced, and the jury heard Stewart's statements about dating many women, about having had access to a gun and ammunition, about having argued with Sophia during their relationship, and about having been with her on the night she was murdered.  Tr. 8, 371, 380.  On cross-examination, Detective Jimick admitted that there had not been probable cause to arrest Stewart in 1993, Tr. 387-88; that the NYPD had never recovered the murder weapon or connected the three "of value" fingerprints from Sophia's bedroom to anyone, including Stewart, Tr. 392, 407; and that there were no eyewitnesses or

DNA evidence linking Stewart to the murder, Tr. 407-08.  Accordingly, he conceded, Stewart's interrogation was "definitely a big portion of this case."  Tr. 408.

In closing, the prosecution repeatedly urged the jury to consider Stewart's statements during the interrogation.  Tr. 512 ("We know [what happened] because of the evidence at the scene, and we know a lot more because [of the defendant's interrogation"); *see* Tr. 514, 516, 517, 520.  The prosecution specifically pointed to Stewart's admissions that he had access to a gun and ammunition, that he had had a tempestuous relationship with Sophia, that he had been with her on the night of her murder, and that he had fled to Jamaica out of fear of being blamed. Tr. 514, 520, 524-25.  It explicitly encouraged the jury to rewatch the interrogation video, describing it as revealing Stewart's character, motives, and consciousness of guilt.  Tr. 514, 517. The summation concluded with a power point presentation in which clips from the interrogation video were replayed, during which the prosecution described Stewart's statements as "deceptions," "untruths," and "denials" and insisted that the video "gives you a window into the mind of a killer."  Tr. 535, 538-42.

On October 19, 2017, the jury found Stewart guilty of one count of second-degree murder.  Tr. 579, 582-584.  On November 27, 2017, Stewart was sentenced to a term of imprisonment of twenty years to life.  ECF No. 1-11.

**E.  Post-Trial Procedural History**

Under New York law, a defendant is "entitled to one . . . appeal to the Appellate Division and one request for leave to appeal to the Court of Appeals."  *Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001) (citing N.Y. CRIM. PROC. LAW § 450.10(1); N.Y. COURT R. § 500.10(a)).  In addition to direct appeal, New York also permits defendants to collaterally attack their

convictions through a motion to vacate the judgment under New York Criminal Procedure Law

Section 440.10, a form of state habeas corpus.  *See* N.Y. CRIM. PROC. LAW § 440.10.

On October 9, 2020, Stewart filed a motion pursuant to Section 440.10 (the "CPL

§ 440.10 Motion") arguing that he had been denied effective assistance of counsel because his

attorney had failed to move to dismiss the indictment based on the approximately twenty-three-

year delay between Sophia's 1993 murder and his 2016 indictment.  ECF No. 1-6, at 24, 46-51.

In its opposition to the motion, the State argued, *inter alia*, that there was good cause for delay:

> Plainly, without defendant's videotaped statement, there was insufficient evidence
> to establish defendant's guilt beyond reasonable doubt to ensure a fair
> prosecution. Without defendant's statement, Det. Baldassari's evidence was
> limited to: defendant's fingerprints inside an apartment he routinely stayed [sic],
> an unreported domestic violence history, and "Peter's" phone call to [Esbourne]
> alerting him to Sophia's body.  Indeed, without defendant's admissions, the
> People could not unquestionably prove defendant actually fled to Jamaica (given
> Kenneth Hall was a real person whose identity defendant was still using well-after
> the murder) or that defendant was even in the apartment on the day of the murder.

Resp.'s State Habeas Mem. 21.  On June 29, 2021, the New York Supreme Court adopted the

government's reasoning and denied Stewart's CPL § 440 Motion on the ground that the delay in

prosecution was caused by a lack of evidence rather than "tactical considerations."  *People v.

Stewart*, No. 1805/169, slip op. at 10 (N.Y. Sup. Ct. June 29, 2021).  The court found that,

without Stewart's December 2015 interrogation, the evidence was insufficient even to support

probable cause to arrest Stewart.  *Id.* at 4-9 ("Notably, the defendant only made the damaging

statement that finally provided probable cause for his arrest when, in December of 2015, he was

questioned in Connecticut after being detained by Connecticut authorities for stealing the identity

of Kenneth Hall.").

In June 2022, Stewart appealed to the Appellate Division, First Department, from both his

judgment of conviction at trial and the court's denial of his CPL § 440 Motion.  To the extent

relevant here, he argued that he had invoked his right to silence during the interrogation by

Detectives Jimick and O'Neil such that the use of statements he made thereafter violated his Fifth Amendment rights and that the jury's verdict was against the weight of the evidence.  ECF No. 1-6, at 32-41.  By opinion entered on May 9, 2023, the Appellate Division affirmed Stewart's conviction.  *See Stewart*, 216 A.D.3d at 464.

The Appellate Division rejected Stewart's Fifth Amendment claim in a mere two sentences: "The suppression hearing court properly denied defendant's motion to suppress statements he made to police after he was given *Miranda* warnings.  The record supports the court's finding that, when viewed in context, certain phrases used by defendant did not constitute requests to terminate the interview or unequivocal assertions of the right to remain silent."  *Id.* at 465 (citing *People v. Rodriguez*, 49 A.D.3d 431, 433 (N.Y. App. Div. 1st Dep't 2008); *People v. Garcia*, 284 A.D.2d 106, 107 (N.Y. App. Div. 1st Dep't 2001); *People v. Dawson*, 38 N.Y.3d 1055, 1055-56 (2022)).  Meanwhile, it emphasized Stewart's "highly incriminating" statements during the interrogation in rejecting his weight-of-the-evidence argument:

> In addition to evidence of motive and intent, defendant's statement to the police placed him at the victim's apartment where she was found with a gunshot wound to the head.  This statement was highly incriminating, and the jury could have readily discounted the exculpatory aspect of the statement as implausible. Defendant also acknowledged that during the general time period of the homicide, he carried a firearm consistent with the type of firearm police experts testified was used in this killing.  The apartment showed no signs of forced entry, of a level of disarray that would suggest a burglary, or of a sudden confrontation between the victim and an intruder.  Defendant, who admitted that he had keys to the apartment and who had been intimate with the victim, was the only person other than his and the victim's two-year-old child known to be present in the apartment the night of the murder.  The People also presented significant evidence of consciousness of guilt.

*Id.* at 464 (citations omitted).  In affirming the lower court's denial of Stewart's CPL § 440 Motion, the Appellate Division observed: "Although the police investigatory delay was lengthy, it was satisfactorily explained."  *Id.* at 465.

Stewart sought leave to appeal to the New York Court of Appeals.  Stewart submitted to the Court of Appeals copies of the Appellate Division briefs and, in a letter dated May 18, 2023, asked for review of "all of the issues" he had raised in his brief, "including all Federal and State constitutional issues."  ECF No. 1-2.  In a follow-up letter dated June 13, 2023, Stewart specifically pressed the Court of Appeals to review the rejection of his CPL § 440.10 Motion.  ECF No. 14-2.  In a footnote, Stewart reiterated his request for review of "all state and federal constitutional issues raised on his appeal."  *Id.* at 4 n.4.  On February 20, 2024, a judge of the New York Court of Appeals denied Stewart leave to appeal.  *People v. Stewart*, 41 N.Y.3d 944 (2024); *see also* ECF No. 1-1.  On May 20, 2025, Stewart timely filed his Petition in this Court.  ECF No. 1.  On January 13, 2025, the Court held oral argument.  ECF No. 20.

## LEGAL STANDARDS

The Court's authority to grant the writ of habeas corpus is limited by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Cruz v. Superintendent*, No. 13-CV-2414 (JMF), 2016 WL 2745848, at *5 (S.D.N.Y. May 11, 2016).  Specifically, the Court may grant the writ "with respect to any claim that was adjudicated on the merits in State court proceedings" only if (1) the state court's denial of the petitioner's claim "resulted in a decision that was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States"; (2) the state court's denial of relief "resulted in a decision that . . . involved an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States"; or (3) the state court's denial of relief "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A state court's decision can be "contrary to" Supreme Court precedent in either of two ways: first, "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or, second, "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Court's]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court unreasonably applies clearly established precedent "if the state court identifies the correct governing legal rule" from the Supreme Court's cases "but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. Alternatively, "a state-court decision . . . involves an unreasonable application of [Supreme Court] precedent if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.*; *see also Richard S. v. Carpinello*, 589 F.3d 75, 80 (2d Cir. 2009).

Significantly, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410. That is, the issue is not whether the state courts committed error — or even clear error — but rather "whether the state court's application of clearly established federal law [as determined by the Supreme Court] was objectively unreasonable." *Id.* at 409; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."). Specifically, when AEDPA applies, as it does here, federal habeas relief is precluded "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Klein v. Martin*, — U.S. —, No. 25-51, 2026 WL 189976, at *4 (U.S. Jan. 26, 2026) (per curiam) ("AEDPA review provides an important but limited

safeguard: It protects against extreme malfunctions in the state courts' adjudication of constitutional claims." (cleaned up)).

As noted, a federal court may also grant habeas relief under AEDPA if the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). But a state court's factual determinations are "'presumed to be correct'" and may be rebutted only "'by clear and convincing evidence.'" *Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir. 2003) (quoting 28 U.S.C. § 2254(e)(1)); *accord Bierenbaum v. Graham*, 607 F.3d 36, 48 (2d Cir. 2010). This requires "substantial deference" to the state court's determinations. *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Id.* (cleaned up). Nor may a federal court characterize a state court's decisions as unreasonable "merely because [it] would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). That said, "'[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'" *Brumfield*, 576 U.S. at 314 (quoting *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003)).

## DISCUSSION

Stewart argues that each time he uttered the words "I'm done" during the December 2015 interrogation he invoked his right to remain silent and that the trial court's admission of statements he made in response to the Detectives' questioning thereafter violated his rights under the Fifth Amendment. *See* Pet.'s Mem. 15-20. In response, the State makes three arguments: first, that Stewart's claim is procedurally defaulted because he failed to exhaust it in the state courts, *see* ECF No. 15 ("Resp.'s Mem."), at 20-21; second, that the state courts' rejection of

Stewart's claim was not contrary to, or an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States," *see id.* at 21-28; and third, that any error did not cause Stewart actual prejudice because a "juggernaut" of other evidence supported his conviction, *see id.* at 28-32.

The Court will consider each of the State's arguments in turn.

## A. Stewart Exhausted His Fifth Amendment Claim

The Court need not dwell long on the State's exhaustion argument. It is certainly true that, before bringing a habeas claim in federal court, "a state prisoner must first have presented his claim to the highest court of the state." *Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000). But Stewart indisputably did so through his May 2023 letter to the New York Court of Appeals, in which he expressly requested review of "*all* state and federal constitutional issues raised on his appeal" and submitted his Appellate Division brief, in which he indisputably presented his Fifth Amendment claim. ECF No. 1-2 (emphasis added); *see, e.g.*, *Bumpus v. Warden Clinton Corr. Facility*, 311 F. App'x 400, 401-02 (2d Cir. 2009) (summary order) (finding no procedural default where the petitioner included his Appellate Division briefs with his leave application, thus signifying that all issues were to be considered); *Moncayo v. Superintendent Green Haven Corr. Facility*, 797 F. Supp. 3d 175, 193 n.6 (E.D.N.Y. 2025) (finding exhaustion when "[a]ppellate counsel did not explicitly raise [the relevant] claims with the Court of Appeals, but he did request leave to appeal 'all federal and state constitutional issues raised in his appeal to the Appellate Division'"); *Robinson v. Superintendent, Green Haven Corr. Facility*, No. 21-CV-7218 (DG) (LB), 2024 WL 4933363, at *4 (E.D.N.Y. Oct. 21, 2024) ("In New York, fair presentation of a claim to the Court of Appeals, the state's highest court, requires a petitioner to seek review of that claim by the Court of Appeals; a petitioner may do so in a concise letter

application seeking review of all issues raised in his Appellate Division brief."), *report and recommendation adopted*, 2024 WL 4932747 (E.D.N.Y. Dec. 2, 2024).

In arguing otherwise, the State rests on the fact that Stewart's supplemental letter in June 2023 focused on his CPL § 440.10 Motion and cites *Jordan v. Lefevre*, 206 F.3d 196 (2d. Cir. 2000).  *See* Resp.'s Mem. 20-21.  But the supplemental letter did not withdraw the earlier request for review of "*all* state and federal constitutional issues raised on his appeal"; in fact, it renewed that request and specifically cited his Fifth Amendment claim.  *See* ECF No. 14-2, at 4 n.4.  In any event, even without that reference, the State's argument is squarely foreclosed by *Morgan*, in which the Second Circuit held that where, as here, "a defendant's first letter to the Court of Appeals seeks leave to appeal all arguments raised in attached Appellate Division briefs, a follow up letter addressing only some of those arguments in more detail does not serve to narrow the scope of the claims 'fairly presented' by the first letter."  *Bumpus*, 311 F. App'x at 401 (quoting *Morgan*, 204 F.3d at 370); *see also Morgan*, 204 F.3d at 371 (holding that it is not "appropriate to infer that the New York Court of Appeals would construe [a defendant's] second letter as eliminating issues as to which review had been expressly requested.").  Meanwhile *Jordan* is distinguishable because here, unlike in that case, Stewart "clearly stated that he was pressing all of the [constitutional] claims raised" in his submitted Appellate Division brief.  206 F.3d at 199.  As the Second Circuit recognized in *Jordan* and confirmed in *Morgan*, that was enough to put the New York Court of Appeals on fair notice as to the existence of the claims.

At oral argument, the State wisely conceded that its exhaustion argument was its "weakest argument."  Oral Argument Tr. ("Arg. Tr."), at 14.  If anything, that concession is an understatement.  The State's exhaustion argument is squarely foreclosed by Circuit precedent and, thus, frivolous.  Accordingly, the Court will turn to the merits of Stewart's claim.

**B. The State Court's Decision Was Contrary to Clearly Established Federal Law**

The Constitution protects "against compelled self-incrimination" by establishing "'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'" *Florida v. Powell*, 559 U.S. 50, 59 (2010) (quoting *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989)). Specifically, pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny, "suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation." *Thompson v. Keohane*, 516 U.S. 99, 107 (1995); *see Miranda*, 384 U.S. at 473-74. Police must then "respect the accused's decision to exercise the rights outlined in the warnings." *Moran v. Burbine*, 475 U.S. 412, 420 (1986). As relevant here, once a person invokes the right to remain silent "in any manner, at any time prior to or during questioning," interrogation must cease. *Miranda*, 384 U.S. at 473-74. Indeed, the Supreme Court has emphasized that the right to remain silent, once invoked, must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 103 (1975) (quoting *Miranda*, 384 U.S. at 479). Any statements taken after the invocation of the right "cannot be other than the product of compulsion, subtle or otherwise." *Miranda*, 384 U.S. at 474.

Importantly, the police need not cease their questioning unless the suspect's invocation of his *Miranda* rights is unambiguous and unequivocal. *See Davis v. United States*, 512 U.S. 452, 459 (1994) (applying that standard to the right to counsel); *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (applying that standard to the right to remain silent and explaining that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel"). "If an accused makes a

statement concerning [a *Miranda* right] 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Thompkins*, 560 U.S. at 381 (citations and internal quotation marks omitted).[2]  Requiring an unambiguous invocation, the Court has explained, "results in an objective inquiry that 'avoid[s] difficulties of proof.'" *Id.* (quoting *Davis*, 512 U.S. at 458-59).  It also "'provide[s] guidance to officers' on how to proceed in the face of ambiguity.  If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'" *Id.* (quoting *Davis*, 512 U.S. at 461).

Although the line between an ambiguous or equivocal invocation, on the one hand, and an unambiguous and unequivocal invocation, on the other, can sometimes be difficult to discern, the Supreme Court's cases provide helpful guidance.  An accused need not rely on talismanic phrases or "any special combination of words" to invoke the right to remain silent, *Quinn v. United States,* 349 U.S. 155, 162 (1955), nor "speak with the discrimination of an Oxford don,"

---

[2]      This language in *Thompkins* casts doubt on the validity of older Second Circuit cases, which had held that "where a suspect has invoked his right equivocally or ambiguously, the officers are permitted to ask narrow questions only for the purpose of clarifying the ambiguity." *United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir. 1996); *accord Diaz v. Senkowski*, 76 F.3d 61, 63-64 (2d Cir. 1996); *Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir. 1989).  *But see United States v. Ross*, No. 21-CR-571 (BMC) (LB), 2023 WL 6160436, at *9 (E.D.N.Y. July 31, 2023) (citing these Second Circuit cases approvingly), *report and recommendation adopted*, No. 21-CR-571 (BMC), 2023 WL 6158840 (E.D.N.Y. Sept. 21, 2023); *United States v. Brooks*, No. 23-CR-6209-CJS-MJP, 2024 WL 4694262, at *9 (W.D.N.Y. Aug. 16, 2024) (same), *report and recommendation adopted as modified,* No. 23-CR-6209 CJS/MWP, 2024 WL 4441731 (W.D.N.Y. Oct. 8, 2024) (same).  Accordingly — and because, in any event, "AEDPA permits [the Court] to rely only on clearly established Supreme Court precedent," *Drake v. Portuondo*, 321 F.3d 338, 345 n.2 (2d Cir. 2003) — the Court declines to rely on this line of cases here.

*Davis,* 512 U.S. at 459.  Instead, a suspect need only invoke his rights "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be [such] a request." *Id.*  The suspect's words should be "understood as ordinary people would understand them" and given their "ordinary meaning." *Connecticut v. Barrett*, 479 U.S. 523, 529-30 (1987).  An accused, the Court has explained, may "invoke[] his 'right to cut off questioning'" with *any* "simple, unambiguous statement[]." *Thompkins*, 560 U.S. at 382.  A suspect's statement "that he wanted to remain silent or that he did not want to talk with the police," for example, would suffice. *Id.*; *see, e.g.*, *Arnold v. Runnels,* 421 F.3d 859, 865 (9th Cir. 2005) ("[N]either the Supreme Court nor this court has required that a suspect seeking to invoke his right to silence provide any statement more explicit or more technically-worded than 'I have nothing to say.'").

Significantly, Supreme Court cases also cabin whether and to what extent a court may consider context in evaluating whether a suspect's purported invocation is unambiguous and unequivocal.  First, "[i]nterpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous." *Barrett*, 479 U.S. at 529.  Second, "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith v. Illinois*, 469 U.S. 91, 100 (1984) (per curiam) (emphasis in original).  As the Court explained in *Smith*: "No authority, and no logic, permits the interrogator to proceed on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all." *Id.* at 99 (cleaned up).  Thus, "[w]here nothing about the request . . . or the circumstances leading up to the request render it ambiguous, *all questioning must cease*." *Id.* at 98 (emphasis added).  "In the absence of such a bright-line prohibition," the Court reasoned, "the authorities through badgering

or overreaching — explicit or subtle, deliberate or unintentional — might otherwise wear down

the accused and persuade him to incriminate himself notwithstanding his earlier request . . . ."

*Id.* (cleaned up).

Relying on the foregoing principles, Stewart argues that he invoked his right to remain

silent three times during the December 2015 interrogation — namely, each time that he uttered

the words "I'm done" — and that, in concluding otherwise, the Appellate Division's decision

was contrary to, or an unreasonable application of, clearly established federal law as determined

by the Supreme Court. Pet.'s Mem. 14-15.[3] As to the first purported invocation — "I'm done

saying what I got to say because I don't know nothing, I don't know nothing about that," Int. Tr.

41-42; Video 9:50:35 — the Court disagrees. To be sure, the phrase "I'm done saying what I got

to say" alone would almost certainly have qualified as an unequivocal invocation. But Stewart

did not leave it there — he proceeded, unprompted, to explain that he was "done" *because* he did

not know the answers to the Detectives' questions. In doing so, a reasonable police officer in the

circumstances could have understood Stewart's words to mean that he was done answering

---

[3]     Because the New York Court of Appeals denied Stewart's application for leave to appeal
without explanation, the relevant decision for purposes of AEDPA review is the decision of the
Appellate Division. *See Wilson v. Sellers*, 584 U.S. 122, 125 (2018) (holding that when "the
relevant state-court decision on the merits, say, a state supreme court decision, does not come
accompanied with [reasoning on the merits], . . . the federal court should 'look through' the
unexplained decision to the last related state-court decision that does provide a relevant
rationale."); *Garcia v. Griffin*, No. 16-CV-2584 (ALC) (RWL), 2018 WL 9801209, at *7 n.9
(S.D.N.Y. May 8, 2018) ("Because the Appellate Division's opinion is the last reasoned state-
court decision on this issue, the Court considers that decision 'the relevant state-court decision'
to be reviewed under AEDPA."), *report and recommendation adopted*, 2019 WL 4917183
(S.D.N.Y. Oct. 4, 2019). That said, the relevant portion of the Appellate Division's decision is
only two sentences long and effectively adopted the reasoning of the trial court. Accordingly,
the Court may "look at both decisions to fully ascertain the reasoning of the last decision, even
while [it] formally review[s] only the final determination." *Jones v. Murphy*, 694 F.3d 225, 241
n.8 (2d Cir. 2012). In any event, the Court would reach the same conclusions absent
consideration of the trial court's reasoning, as the Appellate Division's decision is itself contrary
to, and an unreasonable application of, clearly established Supreme Court law.

questions on the subjects of the interrogation to that point — not that he was done answering questions altogether.  At a minimum, with respect to *this* purported invocation, the Court cannot say that the state court's ruling was contrary to, or an unreasonable application of, Supreme Court precedent.  *See, e.g.*, *Bird v. Brigano*, 295 F. App'x 36, 38 (6th Cir. 2008) (unpublished) (holding that a state court did not unreasonably conclude that the defendant's statement, when pointing to a list of people who had been interviewed by the police, that "[e]verything's right there in the paper.  I'm done talking about it" was ambiguous in context because a reasonable police officer could have understood the statement to mean that all pertinent information had been revealed by the other witnesses and that the defendant had nothing more to add, not that he had been invoking his right to silence).

By contrast, the Court concludes that, with respect to the second and third times that Stewart told the Detectives he was "done" — which were separated by only about five minutes — the Appellate Division's decision was contrary to, and an unreasonable application of, clearly established Supreme Court law.  In each instance, Stewart's statement that he was "done" was unqualified.  Moreover, in the second instance, Stewart greeted the Detectives' continued interrogation with a deep sigh of apparent frustration.  In these two instances, Stewart "did not equivocate in his invocation by using words such as 'maybe' or 'might' or 'I think.'"  *Anderson v. Terhune*, 516 F.3d 781, 788 (9th Cir. 2008) (en banc).  Nor did he muddy his intentions by stating, as he had when he first used the words "I'm done," that he did not "know nothing" about a particular subject.  Put simply, the unadorned words "I'm done" have — and had — only one "ordinary meaning."  *Barrett*, 479 U.S. at 530.  Under *Miranda* and its progeny, no reasonable police officer could have construed these two "simple, unambiguous statements" to mean

something other than that Stewart was "invok[ing] his right to cut off questioning."  *Thompkins*,

560 U.S. at 382 (cleaned up).  Thus, "all questioning [had to] cease."  *Smith*, 469 U.S. at 98.

Making matters worse, the state courts concluded otherwise only by considering

"context" in a way flatly prohibited by the Supreme Court.  As the Ninth Circuit has

summarized, "*Smith* mandates that all questioning must immediately cease once the right to

remain silent is invoked, and that any subsequent statements by the defendant in response to

continued interrogation cannot be used to find a waiver or cast ambiguity on the earlier

invocation."  *Anderson*, 516 F.3d at 791.  Yet the Detectives here did not cease their questioning

when Stewart flatly said "I'm done."  And far from ignoring Stewart's "subsequent statements

. . . in response to continued interrogation," the state trial court (and, by extension, the Appellate

Division, which all but explicitly adopted the trial court's reasoning in affirming) relied

extensively on those statements to conclude that his prior references to being "done" were

ambiguous.  *See* Suppression Op. 14 ("[T]aken in context with the preceding interrogation *and

with what followed*, it can be seen that [the] statement . . . was not an unequivocal invocation of

[Stewart's] right to remain silent . . . ." (emphasis added)); *id.* at 16 ("The conclusion that the

defendant did not invoke his right to remain silent is reinforced by *statements the defendant

made thereafter*." (emphasis added)); *id.* ("As the interview continued, the defendant

underscored his willingness to speak to the detectives."); *id.* ("[T]he defendant continued to

speak to the detectives and to respond to their questions, throughout the remainder of the

interview.").  Using Stewart's "post-invocation statements against him" in this manner was, by

itself, "contrary to," and an unreasonable application of, "clearly established Supreme Court case law." *Jones v. Harrington*, 829 F.3d 1128, 1132 (9th Cir. 2016).[4]

The Court's conclusion that the Appellate Division's decision with respect to Stewart's second and third purported invocations was contrary to, and an unreasonable application of, clearly established Supreme Court law is strengthened by a survey of relevant lower court decisions. In fact, as far as the Court is aware, every lower federal court that has considered the question (whether subject to the AEDPA standard or not) has held that a suspect's unqualified statement such as "I'm done" constitutes an unequivocal invocation of the right to silence. *See, e.g.*, *Jones*, 829 F.3d at 1141 (holding that a state court decision was objectively unreasonable where it held that the statement "I don't want to talk no more" was an ambiguous invocation); *Kon v. Gamboa*, No. 21-55430, 2022 WL 457945, at *1 (9th Cir. Feb. 15, 2022) (unpublished) (same when the petitioner had said "So tired. That's all I have to say. Y'know."); *Bates v. Clark*, 365 F. App'x 840, 841 (9th Cir. 2010) (unpublished) (same with the statement, "I'm not saying anything right now"); *United States v. Yodprasit*, No. CR15-4085-MWB, 2016 WL 11384518, at *2 (N.D. Iowa Feb. 29, 2016) ("Defendant's statement, 'I am done talking to you,'

---

[4]      The State does not question *Smith* — and thus has forfeited any argument that *Smith* should be overruled. In fact, during oral argument, counsel for the State conceded that *Smith* is clearly established federal law and explicitly disavowed any challenge to its holding:

> THE COURT:    [T]o the extent that the state courts did look to what he said in response to questions after the words "I am done" to elucidate what those words meant, you would agree, would you not, that that violates *Smith v. Illinois*?

> COUNSEL:    Yes, I do. . . . [I] will agree with you on what the law says, that they can't use the later to change the unambiguous statement. That's correct. And I agree with that and I'm not trying to argue otherwise.

Arg. Tr. 23-24.

was an unequivocal invocation of the right to remain silent"), *report and recommendation adopted,* No. CR15-4085-MWB, 2016 WL 1069671 (N.D. Iowa Mar. 17, 2016); *Saeger v. Avila*, 930 F. Supp. 2d 1009, 1018 (E.D. Wis. 2013) (same for "I got nothing more to say.  I'm done.  This is over."); *Flores v. Muniz*, No. 16-CV-1476-LJO-MJS (HC), 2018 WL 1806184, at *11 (E.D. Cal. Apr. 17, 2018) (same for "I'm done talking"), *aff'd,* 809 F. App'x 463 (9th Cir. 2020); *United States v. Adams*, No. CR 15-106 (PJS/FLN), 2016 WL 385965, at *3 (D. Minn. Jan. 7, 2016) (same for "I'm done talking to you"); *United States v. Gulledge*, No. 1:19-CR-177-TWP-MJD, 2020 WL 6737450, at *3 (S.D. Ind. Sept. 14, 2020) (same for "I'm done talking"); *United States v. Forrester*, No. CR-24-57-RAW, 2024 WL 3892950, at *8-13 (E.D. Okla. July 17, 2024) (same for "[t]hat's it.  I'm done.  F*** this" and "I'm done"), *report and recommendation adopted,* No. CR-24-57-RAW, 2024 WL 3888683 (E.D. Okla. Aug. 21, 2024); *see also United States v. Brooks*, No. 23-CR-6209 CJS/MWP, 2024 WL 4441731, at *1 (W.D.N.Y. Oct. 8, 2024) (suppressing statements made after the defendant said "I don't honestly because there is nothing to talk about.  There's nothin-there's nothin, you know that's bad that's going on"); *United States v. Griffin-Bey*, No. 22-CR-173 (ARR), 2022 WL 7060534, at *5 (E.D.N.Y. Oct. 12, 2022) (same when defendant said "I don't have anything to say."); *United States v. Coriz*, No. 17-1105, 2018 WL 4222383, at *5 (D.N.M. Sept. 5, 2018) (same for "I have nothing more to say," and "I don't need to say anymore"); *United States v. Morales*, No. 19-CR-03255-BTM, 2020 WL 7226439, at *2 (S.D. Cal. Dec. 8, 2020) (same for "I mean, that's all you got for me, then I ain't got nothing to say, right?").[5]

---

[5]    In *Becker v. Wetzel*, No. CV 19-1032, 2020 WL 4674118, (E.D. Pa. Aug. 12, 2020), the court observed that "[c]ourts construe statements such as 'I have nothing more to say' and 'I'm done' [as] both ambiguous and unambiguous invocations of the right to remain silent after *Berghuis*."  *Id.* at *21.  In actual fact, however, the court cited no case in which a court had held that an *unqualified* statement such as "I'm done" was ambiguous.  *Id.* (citing *United States v.*

The decisions in *Saeger* and *Flores* are especially instructive. In *Saeger*, the defendant stated during questioning — much like Stewart did here — "I got nothin[g] more to say to you. I'm done. This is over.'" 930 F. Supp. 2d at 1011. Nevertheless, the state court ruled that, "[t]aken in context," Saeger's words could be understood either as an invocation or a "fencing mechanism to get a better deal" and, thus, did not qualify as an unequivocal invocation. *Id.* at 1013. On federal habeas, the district court held by doing so — by "'[u]sing context to transform an unambiguous invocation into open-ended ambiguity'" — the state court had violated clearly established federal law. *Id.* at 1016 (quoting *Anderson*, 516 F.3d at 787). "There is no ambiguity," the *Saeger* court reasoned, "about the plain language Saeger used: 'I got nothin[g] more to say to you. I'm done. This is over.' He used no conditional or equivocal words. He did not vacillate or say 'maybe' or 'I think' or 'if,' for example." *Id.* at 1015. It mattered not, the court explained, that Saeger had "continued to negotiate with the detectives immediately after stating '[t]his is over.'" *Id.* at 1016. "[W]here the request for questioning to stop is clear, '*postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself.'" *Id.* (quoting *Smith,* 469 U.S. at 100).

---

*Ward*, No. CR 15-36-KKC, 2015 WL 5474232, at *5 (E.D. Ky. Sept. 17, 2015); *United States v. Johnson*, No. 11-CR-49, 2011 WL 2604774, at *3 (W.D. Mich. June 30, 2011); and *United States v. Newland*, No. 09-CR-71, 2010 WL 2629504 (N.D. Ind. June 25, 2010)). Instead, the cases cited by the *Becker* court are examples of cases, discussed below, in which the defendant invoked the right to remain silent but then muddied (or waived) that invocation by immediately speaking without prompting by the police. *See Ward*, 2015 WL 5474232 at *2 (denying a motion to suppress where the defendant stated that he "was done" but immediately elaborated that he wanted to smoke and see his girlfriend and questioning resumed only after he was given the opportunity to smoke and see his family); *Johnson*, 2011 WL 2604774, at *3 (denying a motion to suppress where the defendant had said "I don't really even want to get into it," but "immediately proceed[ed] to get into it"); *Newland*, 2010 WL 2629504, at *4 (same when the defendant "became angry and on two separate occasions stated that he wanted to go back upstairs, but then continued talking immediately after each such comment").

*Flores* involved a similar statement: "I'm done talking."  2018 WL 1806184, at *9. Relying in part on the fact that the defendant had continued to engage in conversation with investigators, the state court held that this statement did not constitute "an unequivocal and unambiguous assertion" of the right to silence.  *Id.* at *8.  On federal habeas, the district court and Ninth Circuit held that this conclusion was "contrary to and an unreasonable application of *Miranda*."  *Id.* at *11.  The defendant's statement, the district court explained, represented "a clear, unambiguous, and unequivocal invocation of the right to remain silent."  *Id.* at *10.  He "did not state, 'I'm done talking *now*' or 'I'm done talking *to you*,' statements which might have cast doubt on whether [he] truly wished to remain entirely silent.  Nor did Petitioner follow this statement with questions or other indications that he desired to talk further."  *Id.*  As in *Saeger*, the court dismissed as "irrelevant" the fact that the defendant had "continued to converse after having stated, 'I'm done talking.'"  *Id.* at *11.  "It is well-settled, and was well-settled at the time of the events at issue here, that the Court may not look 'to post-invocation statements to "cast retrospective doubt on the clarity of [Petitioner's] initial request itself."'"  *Id.* (quoting *Jones*, 829 F.3d at 1140, which, in turn, was quoting *Smith*, 469 U.S. at 98-99).

This case is on all fours with *Saeger* and *Flores*.  By contrast, the cases on which the State relies in opposing Stewart's petition — *United States v. Dawes*, 495 F. App'x 117 (2d Cir. 2012), *United States v. Ross*, No. 21-CR-571 (BMC)(LB), 2023 WL 6160436, at *1 (E.D.N.Y. July 31, 2023), *report and recommendation adopted*, 2023 WL 6158840 (E.D.N.Y. Sept. 21, 2023), and *Bradley v. Meachum*, 918 F.2d 338 (2d Cir. 1990) — are easily distinguished. Resp.'s Mem. 25-27; Arg. Tr. 34 (counsel for the State describing *Ross* and *Dawes* as "the best

cases" for the State's position).[6]  In *Dawes*, for example, the defendant stated "'I plead the Fifth

Commandment,' but he immediately queried, 'I want to know why I'm here.'"  495 F. App'x at

120.  The defendant's *own* "nearly simultaneous comments and conduct," the Second Circuit

concluded, rendered his otherwise clear invocation of his Fifth Amendment rights equivocal.

*See id.* at 119-20.  Similarly, in *Ross*, the defendant stated, "I don't want to talk and get myself

into more trouble, man," but he then "did not stop speaking; *before the officers interjected, Ross*

*continued to speak*."  2023 WL 6160436, at *10 (emphasis added).  These "subsequent

statements," the court concluded, "turned what may have been an unequivocal statement into an

ambiguous one."  *Id.*  And finally, in *Bradley*, the defendant "initially stated that he did not wish

to discuss his involvement in the crime, but [then] immediately denied any connection to the

robbery and proffered an explanation of his whereabouts at the time of the crime."  918 F.2d at

342.  In each case, that is, the defendant's own *unprompted* follow-up statements turned what

would otherwise have been an unambiguous invocation of silence into an ambiguous one.[7]  The

---

[6]  A fourth case cited by the State — *United States v. Ramirez*, 79 F.3d 298 (2d Cir. 1996),
*see* Resp.'s Mem. 25-26 — is altogether inapposite.  There, the court held that the defendant did
not invoke his right to remain silent by answering some questions and remaining silent as to
others.  *See* 79 F.3d at 301-02, 305.

[7]  Although not cited by the State, other courts have reached the same conclusion in similar
circumstances.  *See, e.g.*, *Becker v. Wetzel*, No. CV 19-1032, 2020 WL 4674118, at *19 (E.D.
Pa. Aug. 12, 2020) (denying a habeas petition under the AEDPA standard when the defendant
said "OK. I'm done now" but "continued to engage troopers in conversation *immediately*
following each alleged invocation" (emphasis added)); *United States v. Sullivan*, No. CR18-5273
BHS, 2020 WL 6392797, at *5 (W.D. Wash. Nov. 2, 2020) (holding that the defendant's
statement that he was "done" to be equivocal because, "[i]n each instance after [Defendant]
invoked his right to silence, he immediately re-initiated the conversation"); *United States v.
Smith*, No. 13-CR-20263, 2013 WL 5745133, at *5 (E.D. Mich. Oct. 23, 2013) (denying a
motion to suppress because at each point that the defendant "said, 'I'm done,' he continued
talking" and because when defendant "said more forcefully, 'I'm done talking'  and that he
wanted to 'call his girl,' [the Officer] stopped questioning him" (citations omitted)); *United
States v. Williams*, 690 F. Supp. 2d 829, 836 (D. Minn. 2010) (same when the defendant said she

same cannot be said here. To the extent that Stewart made any statements following his unqualified use of the words "I'm done," they were prompted by the Detectives' continued questioning. To consider those statements in the analysis, therefore, would be contrary to the Supreme Court's holding in *Smith*.

The State also errs, as the state trial court did, in speculating about *why* Stewart said twice, without qualification, that he was "done." *See, e.g.*, Resp.'s Mem. 24 ("This, in context, was yet another expression that petitioner did not like *where* the detectives were going with the questions, rather than asking them not to question him at all."); *id.* at 27 ("His overarching goal was not to stop the interview; instead, it was to steer the conversation in order to gain more information about why the detectives were questioning him."); *id.* at 28 ("[T]he context of petitioner's remarks about being 'done' made clear only that he wanted to change the subject and that he wished for the detectives to tell him what they were really investigating."); Arg. Tr. 25-26 (counsel for the State arguing that Stewart said "I'm done" because he was annoyed at the Detectives' questioning, frustrated, and trying to "game" the Detectives); *see also* Suppression Op. 15 ("The defendant's statements to the detectives reveal . . . his *feeling* that he had answered their questions . . . ." (emphasis added)); *id.* (pointing to a statement as evidence of Stewart's "interest in knowing what the detectives were looking into, and his apparent frustration in not finding out"); *id.* (pointing to a statement as evidence of "[t]he defendant's desire to find out what the detectives were investigating"). Put simply, "[t]he law does not require that a suspect unambiguously invoke the right to remain silent and also explain *why* they are doing so." *Saeger*, 930 F. Supp. 2d at 1016; *see also Anderson v. Smith*, 751 F.2d 96, 105 (2d Cir. 1984)

---

was "'done,' . . . but, without pause, quickly launche[d] into a monologue explaining her situation and claiming 'I didn't do anything'").

("The interrogator never needs to know *why* a suspect wants to remain silent; once it is clear that the suspect wants to remain silent, the interrogation should cease.  After all, the Fifth Amendment assumes that the suspect invokes his right in order not to be a witness against himself; that is reason enough." (emphasis added)); *Anderson*, 516 F.3d at 788 (rejecting the government's argument that the defendant's invocations "were 'statements of frustration'" as "miss[ing] the point" because "[a] suspect can both be frustrated with an interrogation and seek to terminate it").  Indeed, as the Supreme Court has held, the relevant inquiry is an "objective" one, *Thompkins*, 560 U.S. at 381, that focuses on the "ordinary meaning" of a defendant's words, *Barrett*, 479 U.S. at 530 — not on the suspect's subjective intent.  The Supreme Court has never endorsed doing what the state trial court did here: making a speculative "foray into the mental state of the accused." *Saeger*, 930 F. Supp. 2d at 1017.  Indeed, that "is exactly the kind of 'difficult decision[] about an accused's unclear intent' sought to be avoided by the bright-line rule stated in *Miranda* and the requirement that a suspect unambiguously invoke the right to remain silent." *Id.* (quoting *Thompkins,* 560 U.S. at 382).

In short, by "[u]sing 'context,'" *id.* at 1016  — and, in particular, "*postrequest* responses to further interrogation," *Smith*, 469 U.S. at 100 — "to transform an unambiguous invocation into open-ended ambiguity," *Anderson*, 516 F.3d at 787, the Appellate Division in this case reached a decision that was contrary to, and an unreasonable application of, clearly established federal law.

## C.  The Error Caused Stewart Actual Prejudice

That does not end the analysis because, to be granted relief under Section 2254, a petitioner must also show that the violation resulted in "actual prejudice." *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993) (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)); *see United States v.*

*Frady*, 456 U.S. 152, 167 (1982).  More specifically, habeas relief is available only if the constitutional error had a "substantial and injurious effect or influence" on the jury's verdict. *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  The following nonexclusive factors bear on whether the erroneous admission of evidence meets that standard: "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." *United States v. Taylor*, 745 F.3d 15, 27 (2d Cir. 2014) (internal quotations omitted) (quoting *Zappulla v. New York*, 391 F.3d 462, 468 (2d Cir. 2004)); *see Latine v. Mann*, 25 F.3d 1162, 1167-68 (2d Cir. 1994) (observing that "[t]he strength of the prosecution's case is probably the single most critical factor").  Applying these factors, the Court easily concludes that the erroneous admission of Stewart's custodial statements had a "substantial and injurious effect or influence" on the jury's verdict.  *Brecht*, 507 U.S. at 623.

In fact, the State is arguably estopped from disputing that conclusion.  Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Chevron Corp. v. Donziger*, 833 F.3d 74, 127 (2d Cir. 2016) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)); *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." (cleaned up)).  Here, the State explicitly argued in opposing Stewart's CPL § 440 Motion that, absent Stewart's custodial statements, "there was insufficient evidence to establish defendant's guilt beyond reasonable

doubt," Resp.'s State Habeas Mem. 21, and the state court adopted that argument in rejecting Stewart's speedy trial claim, *Stewart*, No. 1805/169, slip op. at 4-9.  (In fact, the court went further, finding that, until Stewart's custodial statements, there had *not even been probable cause to arrest him* for Sophia's murder.  *Id.* at 6-7, 9.)  Yet the State now backtracks and tries to assert the exact opposite: that a "juggernaut of evidence" otherwise supported Stewart's conviction and that his post-invocation statements "did *nothing* to further the state's case at trial."  Resp.'s Mem. at 29-31 (emphasis added); *see id.* at 28 (asserting that "overwhelming circumstantial evidence" proved Stewart's guilt and that his unlawfully procured statements "were largely cumulative of other unchallenged trial evidence").  The State cannot run away from its prior admissions so easily.  Indeed, arguing that Stewart's conviction was supported by a "juggernaut" of other evidence — without even acknowledging its contrary argument before the state courts — is borderline sanctionable.

In any event, the Court need not rely on judicial estoppel to conclude that the erroneous admission of Stewart's post-invocation statements caused him actual prejudice.  As Detective Jimick conceded on cross-examination at trial, there was no eyewitness testimony or physical evidence connecting Stewart to the crime.  Tr. 392, 407-08.  Moreover, investigators found three "of value" fingerprints in Sophia's bedroom that matched neither her nor Stewart.  Tr. 392. Little wonder, then, that Detective Jimick admitted on cross-examination that Stewart's interrogation was "a big portion of this case."  Tr. 408.  Indeed, without Stewart's erroneously admitted statements, the State's evidence was — in its own words — largely "limited to: defendant's fingerprints inside an apartment he routinely stayed [sic], an unreported domestic violence history, and 'Peter's' phone call to [Esbourne] alerting him to Sophia's body."  Resp.'s State Habeas Mem. 21.  As the State itself admitted, that evidence was not sufficient to prove

Stewart's guilt beyond a reasonable doubt. *See id.* Indeed, it arguably was not even sufficient to support Stewart's *arrest*. *See Stewart*, No. 1805/169, slip op. at 9 ("[T]he defendant only made the damaging statement that finally provided *probable cause* for his arrest when, in December of 2015, he was questioned in Connecticut" (emphasis added)).

In trying to run away from its prior admissions, the State now argues that the "most useful new evidence for trial" came from the statements Stewart made before saying he was "done." Resp.'s Mem. 31. The State points, in particular, to Stewart's statements that he had multiple identities, that he initially said he had a son named Jamal (which he then denied repeatedly), and that he had said he did not know Sophia. *See id.* at 30.[8]  But these admissions alone did not directly connect Stewart to Sophia's murder — and, more to the point, do not negate the "substantial and injurious" effect of the post-invocation statements on the verdict. Indeed, Stewart's most inculpatory admissions — the fact that he had access to a firearm and

---

[8]      At oral argument, the Court pressed counsel for the State to identify the statements from before Stewart's second "I'm done" that supported the jury's verdict. *See* Arg. Tr. 16. In response, counsel for the State suggested that, before invoking the right to remain silent, Stewart had already admitted that he was the father of Sophia's child, Jamal; that he had lived with Sophia "for a long time"; and that he fled to Jamaica after the murder. *Id.* at 17, 20. Even if true, however, that would not be enough to salvage the jury's verdict, as those statements did not place Stewart at the scene, let alone implicate him in the murder. And in any event, counsel misstates the record. For one, Stewart did not admit to being the father of Sophia's child, Jamal, pre-invocation. When initially asked for the names of his children, Stewart provided several names, including Jamal. Int. Tr. 13. But, when the Detectives showed Stewart a picture of Sophia's son, Jamal, he denied being the boy's father. *Id.* at 26-29. And Stewart repeatedly denied knowing Sophia, let alone living with her, until well after his invocations of the right to remain silent. *See, e.g.*, Int. Tr. 40; Video 9:49:30-9:49:50 (Stewart denies knowing Sophia); *see also* Int. Tr. 109; Video 10:28:51-10:29:05 (admitting for the first time that he had seen Sophia around). Meanwhile, between the second and third times Stewart said he was "done" (i.e., *after* he invoked his right to remain silent), he did discuss having *been* to Jamaica in 1993. Int. Tr. 84-89. But he did *not* admit that he fled to Jamaica after Sophia's murder; that occurred post-invocation. Int. Tr. 143-46, 164; Video 10:49:46-10:50:06, 11:00:56. Tellingly, when pushed on the point at oral argument, counsel for the State said he did not "want to die on [the] hill" of arguing harmlessness and invited the Court to review the merits. Arg. Tr. 19.

ammunition, that he had had an intimate and tempestuous relationship with Sophia, that he had

been in Sophia's apartment on the day of the murder, and that he had fled to Jamaica on the day

of the murder — all occurred *after* the second and third times that he told the Detectives he was

"done."  Specifically, Stewart did not admit to even knowing Sophia until approximately ten

minutes *after* his third utterance of the words "I'm done" and around fifteen minutes after his

second.  Int. Tr. 109; Video 10:28:51-10:29:05 (admitting that he had "seen [Sophia] around").

Three minutes after that, Stewart admitted for the first time that he had access to a gun in 1993.

Int. Tr. 115-17; Video 10:32:42.  Shortly thereafter, Stewart acknowledged that he had had a

romantic relationship with Sophia, Int. Tr. 117, 120; Video 10:33:50, 10:35:26, and that he had

engaged in at least one incident of domestic violence toward her, Int. Tr. 122-23; Video

10:36:25.  And three minutes after that, Stewart admitted that he had been at Sophia's home on

the night of the murder.  Int. Tr. 129-39; Video 10:39:19.  Only later did Stewart finally also

admit that he had flown to Jamaica on the day of the murder.  Int. Tr. 143-44; Video 10:49:46-

10:50:06.

    These and other post-invocation statements figured prominently in the State's case at trial

and in its victory on direct appeal.  The prosecution repeatedly asked the jury to rely on Stewart's

post-invocation answers to establish its theory — which was otherwise supported only by weak,

circumstantial evidence.  A linchpin of the case, the interrogation was used to prove that Stewart

had been at Sophia's home on the day of the murder and had flown to Jamaica immediately after

Sophia's death.  *See, e.g.*, Tr. 8 ("In that conversation [with the Detectives, Stewart] tells us that

he was with [Sophia] that night, and that he left and that he made that call [to Esbourne]"); Tr.

520 (arguing that "we know" Stewart flees after the murder because Stewart "tells us").

Moreover, the State treated Stewart's post-invocation statements as affirmative evidence of his

motive for, and opportunity to commit, the crime.  The prosecution showed clips of Stewart admitting to having had access to a gun, Tr. 371, 540, and repeatedly referenced Stewart's admission that his relationship with Sophia had been "tumultuous," Tr. 514.  During summation, for instance, the prosecution argued that the jury could believe that "there were numerous occasions in which the defendant exercised control over [Sophia] and used threats and violence against her" because "[i]t's corroborated by the defendant himself."  Tr. 514; *see* Tr. 524-25 ("Everything [Esbourne] said about his daughter's relationship with the defendant is confirmed by the defendant.").  The State hammered that point, referring to a post-invocation statement in arguing that "[t]here is no doubt that this was a violent relationship.  Again, he treated women like garbage . . . .  [H]e's got ten thousand women, that's what he said."  Tr. 514, 541; Video 11:00:25.  The prosecution repeatedly played the jury clips from the interrogation video, asserting that it provided "a window into the mind of a killer."  Tr. 535, 538-42.

        In short, the prosecution's heavy reliance on Stewart's post-invocation statements leaves no doubt that the trial court's erroneous admission of these statements had a "substantial and injurious effect or influence" on the jury's verdict.  *Brecht*, 507 U.S. at 623; *see Taylor*, 745 F.3d at 27 (considering that "[t]he prosecution emphasized [petitioner's admissions] throughout trial, including at opening and closing").  That conclusion is confirmed by the fact that, in affirming Stewart's conviction on direct appeal, the Appellate Division itself relied heavily on Stewart's "highly incriminating" post-invocation statements.  *See Stewart*, 216 A.D.3d at 464 ("[D]efendant's statement to the police placed him at the victim's apartment where she was found with a gunshot wound to the head" and "was highly incriminating."); *id.* (noting that Stewart acknowledged carrying a consistent firearm); *see also Stewart*, No. 1805/169, slip op. at 9 ("[T]he defendant only made the damaging statement that finally provided *probable cause* for

his arrest when, in December of 2015, he was questioned in Connecticut" (emphasis added)).  In other words, the record confirms that the prosecution's case "rested squarely" on the erroneously admitted statements and leaves "grave doubt" that the error did not affect the verdict.  *Hernandez v. McIntosh*, 146 F.4th 142, 162-63 (2d Cir. 2025), *petition for cert. filed*, 25-748 (U.S. Dec. 18, 2025).  It follows that Stewart is entitled to the writ of habeas corpus.  *See id.*; *see also Kotteakos*, 328 U.S. at 765 (instructing that "if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected").

## CONCLUSION

The Court does not lightly grant the writ and disturb Stewart's conviction for murder — a murder, no less, that was committed over three decades ago.  The deference required by AEDPA ensures as much.  But a review of the undisputed record in this case confirms that the Detectives who conducted Stewart's custodial interrogation, and the state courts in turn, failed to "scrupulously honor[]" Stewart's unambiguous and unequivocal invocations of his right to remain silent, as clearly established Supreme Court law required.  *Mosley*, 423 U.S. at 103.  Further, the State itself admitted — correctly — that, absent Stewart's statements, there would have been insufficient evidence to convict him.  It follows that error had a "substantial and injurious effect or influence" on the jury's verdict.  *Brecht*, 507 U.S. at 623.  Thus, the writ of habeas corpus must be and is GRANTED.  Respondent is ordered to release Stewart within ninety days of the date of this Opinion and Order, unless the State declares its intention, within those ninety days, to retry Stewart on the charges against him.  *See, e.g.*, *Bryant v. Thomas*, 274

F. Supp. 3d 166, 191 (S.D.N.Y. 2017), *aff'd*, 725 F. App'x 72 (2d Cir. 2018).  The State shall file

an status update letter ninety days from the date of this Opinion and Order.

      The Clerk of Court is directed to enter judgment accordingly and to close the case.

      SO ORDERED.

Dated: January 28, 2026
     New York, New York

                          JESSE M. FURMAN
                   United States District Judge